UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DANNY PAUL BIBLE, | § | |
| | § | |
| Petitioner, | § | |
| VS. | § | CIVIL ACTION NO. 4:13-CV-200 |
| | § | |
| WILLIAM STEPHENS, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER

In 2003, a Texas jury convicted Danny Paul Bible of capital murder for killing a woman in 1979. After unsuccessfully availing himself of state court remedies, Bible filed a petition for a writ of habeas corpus seeking relief from his capital conviction and death sentence. Respondent William Stephens has filed an answer. After considering the record, the pleadings, and the applicable law -- with particular emphasis on the operation of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), the Court finds that Bible has not shown an entitlement to habeas relief. The Court will deny Bible's petition and not certify any issue for appellate review.

## BACKGROUND

On May 27, 1979, a man found the blood-covered body of 20-year-old Inez Deaton along the slope of a bayou in Houston, Texas. The victim was not wearing pants, and her underwear had been partially torn from her body. Her corpse bore signs of a violent attack. Someone had stabbed her eleven times with an ice pick. Bruises covered her head. Her partially clothed state, along with vaginal and anal trauma, indicated that someone had sexually assaulted her. The physical evidence suggested that her killer had dragged her corpse to the location and then positioned her body by spreading her legs apart.

A few days before, Mrs. Deaton had stopped by the house next door to where Bible lived to use the telephone. Mrs. Deaton was a young mother and friend of Bible's sister. The neighbor suggested that she use the telephone at Bible's home. Another neighbor saw Mrs. Deaton enter Bible's house. No one ever saw Mrs. Deaton alive again.

Around the time of Mrs. Deaton's funeral, Bible disappeared. Over the next two decades Bible lived a life of extreme violence. He fled to Montana and Wyoming where he entered into an abusive relationship with a woman. He committed aggravated kidnappings and theft in Montana. Returning to Texas, he committed rapes and murders. In 1984, he pleaded guilty to a separate murder. After his release on parole, Bible sexually assaulted his five young nieces.

On November 7, 1998, Bible burst into Tera Robinson's[1] hotel room in Louisiana and violently sexually assaulted her. Subsequently, the police arrested him in Florida where he confessed to various prior crimes. On December 16, 1998, Bible gave the Louisiana police a statement admitting to the attack on Ms. Robinson, although he claimed not to remember the actual sexual assault. During that questioning, he informed the Louisiana police that he had murdered Mrs. Deaton. The police in Louisiana contacted authorities in Texas.

 Bible then gave two additional tape-recorded statements on December 18. In the first, Bible confessed to having killed Mrs. Deaton. Bible remembered that he was watching television when Mrs. Deaton came to the door. He immediately grabbed her and forced her to have sex with him. She resisted and they struggled. Bible remembered strangling her and using a knife on her. He remembered putting her in the trunk of a car and dumping her body.

---

[1] By the time of trial, the victim of that sexual assault had married and was using the name Tera Robinson Hoffpauir. Tr. Vol. 22 at 44-46. Both on state habeas and direct review, the state court referred to the witness as "Robinson." This Court will also do so to preserve the continuity of the record.

However, Bible claimed that he could not remember the actual sexual assault or murder. Tr. Vol. 25, SX 3-A; State Habeas Record at 258-69. In a second statement on the same day, Bible confessed to raping a woman in 1983 and then killing her and her baby. Tr. Vol. 25, SX 4; State Habeas Record 273-93. Later, Bible confessed to numerous sexual offenses against his five young nieces between 1996 and 1998. Tr. Vol. 25, SX 5; State Habeas Record at 297-308.

In March 2001, the State of Texas charged Bible by indictment with capital murder for the aggravated rape and murder of Mrs. Deaton. Clerk's Record at 2.[2] Before trial, Bible's attorneys moved to suppress his police statements. After holding a hearing, the trial court denied Bible's motion to suppress.

Testimony in the guilt/innocence phase of trial lasted only two days. Witnesses described the circumstances surrounding Mrs. Deaton's disappearance. Family members testified about suspicious acts by Bible after Mrs. Deaton went missing. The State's case, however, turned on what was called "the most compelling, most believable, best evidence you can ever have in a criminal case:" a confession. Tr. Vol. 16 at 13. Other than Bible's suspicious acts immediately after Mrs. Deaton's disappearance, only his confession connected him to her killing. The jury found Bible guilty of capital murder.

Jurors decided Bible's sentence by answering three questions: (1) did Bible act deliberately, (2) would he constitute a future threat to society, and (3) did mitigating circumstances warrant that he receive a life sentence? Clerk's Record at 199-201. Bible's attorneys faced a herculean task in defending against a death sentence. The prosecution's case portrayed Bible as an extremely violent man who showed little hope of rehabilitation. Through

---

[2] R. P. "Skip" Cornelius and Allen C. Isbell represented Bible at trial. Unless necessary to identify one of the attorneys, the Court will refer to the trial attorneys conjunctively as "trial counsel."

his confessions and testimony from his victims, the prosecution recounted Bible's decades of lawlessness. In an unremitting history of violence toward women and children, Bible had repeatedly committed sexual assaults and kidnappings. He admitted that he had raped his own stepdaughter while holding a knife to his wife's throat. He had raped an eleven-year-old girl in Montana. He beat girlfriends. He had committed robberies and theft. He sexually assaulted his young nieces while on parole from a lengthy prison sentence. His behavior did not improve as he aged. Most importantly, the prosecution showed that Bible had killed at least four times.

Against that background, trial counsel tried to show that Bible could control his behavior in a highly structured environment. The defense argued that Bible had only committed two minor infractions during seventeen years of prior incarceration. A minister testified that he had a spiritual encounter with Bible and that Bible had completed a religious education course.

The jury answered Texas' special issue questions in a manner requiring the imposition of a death sentence.

Through appointed counsel,[3] Bible challenged his conviction and sentence on automatic direct appeal to the Texas Court of Criminal Appeals. Appointed counsel raised sixteen points of error. On May 4, 2005, the Court of Criminal Appeals affirmed in a published opinion. *Bible v. State*, 162 S.W.3d 234 (Tex. Crim. App. 2005). Bible's conviction became final when the time for filing a petition for writ of certiorari to the United States Supreme Court expired on August 2, 2005.

Under Texas law, state appellate and habeas review run concurrently. Through appointed

---

[3] Allen C. Isbell represented Bible on direct appeal. The Court will refer to Mr. Isbell as "appointed counsel."

habeas counsel,[4] Bible filed a state application for a writ of habeas corpus on March 8, 2005. Bible's state habeas application raised seven grounds for relief. Bible's prior attorneys submitted affidavits responding to his claims of ineffective representation. The state habeas court signed the State's proposed findings and conclusions without alteration. State Habeas Record at 394-427. Based on the lower court's order and its own independent review, the Court of Criminal Appeals denied habeas relief. *Ex Parte Danny Paul Bible*, WR-76,122-01, 2012 WL 243564 (Tex. Crim. App. Jan. 25, 2012) (unpublished).[5]

Bible filed a timely federal petition for a writ of habeas corpus. Bible's federal petition raises the following grounds for relief:

1.      The Eighth Amendment's prohibition against cruel and unusual punishment bars the execution of Bible's death sentence because: (a) he no longer poses a future threat to society and (b) society's standards of decency will no longer tolerate capital punishment.

2.      Texas' capital punishment scheme violates due process because: (a) it does not accommodate a post-judgment reassessment of future dangerousness and (b) no standards guide the Texas Board of Pardons and Paroles use of clemency.

3.      Bible received constitutionally ineffective representation when trial counsel: (a) failed to object to a pattern of race-based peremptory strikes; (b) did not object to the prosecution's courtroom reenactment of a violent sexual assault; (c) did not present evidence that the police had secured from Bible false confessions to various extraneous offenses; (d) did not present adequate mitigating evidence in the penalty phase; and (e) ineptly conducted closing argument.

4.      Appellate counsel provided ineffective representation by not raising a claim that the trial court improperly refused to give a lesser-included-offense instruction.

---

[4]  Bob Wicoff ("state habeas counsel") represented Bible on state habeas review.

[5]  The Court of Criminal Appeal adopted the trial court's findings and conclusions except for Findings of Fact 24, 25, 27, 28, 31-37, 39, 42, and 48, and Conclusions of Law 1-6, 8-11, 15, 19, and 20. *Ex Parte Danny Paul Bible*, WR-76,122-01, 2012 WL 243564 (Tex. Crim. App. Jan. 25, 2012) (unpublished).

5.      Insufficient evidence corroborated punishment-phase evidence of Bible's confession to sexually assaulting two young nieces.

6.      The prosecutor violated Bible's constitutional rights by making improper remarks during punishment-phase closing arguments.

7.      Texas does not provide meaningful appellate review of the evidence supporting the jury's finding of future dangerousness.

8.      The State did not prove Bible's future dangerousness beyond a reasonable doubt.

Respondent has filed an answer arguing that substantive and procedural law disentitles Bible to federal habeas relief. (Dkt. No. 15). Bible has replied. (Dkt. No. 20). Bible has also filed an opposed motion for a federal evidentiary hearing on his claim that the Eighth Amendment bars his execution. (Dkt. No. 21). This case is ripe for adjudication.

## LEGAL STANDARDS

The writ of habeas corpus provides an important, but limited, examination of an inmate's conviction and sentence. *See Harrington v. Richter*, 562 U.S. ___, 131 S. Ct. 770, 787 (2011) ("[S]tate courts are the principal forum for asserting constitutional challenges to state convictions."). While "the Framers considered the writ a vital instrument for the protection of individual liberty," *Boumediene v. Bush*, 553 U.S. 723, 743 (2008), "[s]tate courts are adequate forums for the vindication of federal rights." *Burt v. Titlow*, ___ U.S. ___, 134 S. Ct. 10, 15 (2013). Accordingly, "[t]he role of federal habeas proceedings . . . is secondary and limited." *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983); *see also Engle v. Isaac*, 456 U.S. 107, 128 (1982) ("The States possess primary authority for defining and enforcing the criminal law."). Preserving principles of finality, comity, and federalism, the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") confines both the nature and scope of federal habeas review

The AEDPA "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Titlow*, ___ U.S. at ___, 134 S. Ct. at 16. Under 28 U.S.C. § 2254(d), "a federal court cannot grant a petition for a writ of habeas corpus unless the state court's adjudication of the merits was 'contrary to, or involved an unreasonable application of, clearly established Federal law.'" *Berghuis v. Thompkins*, 560 U.S. 370, 378 (2010) (quoting 28 U.S.C. § 2254(d)(1)). "This standard . . . is difficult to meet." *Metrish v. Lancaster*, 569 U.S. ___, 133 S. Ct. 1781, 1786 (2013) (quotation omitted). The Supreme Court has clarified that relief lies under section 2254(d)(1) only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts"; or (2) "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000); *see also White v. Woodall*, ___ U.S. ___, 134 S. Ct. 1697, 1702 (2014); *Thaler v. Haynes*, 559 U.S. 43, 47 (2010); *Bell v. Cone*, 535 U.S. 685, 698 (2002); *Early v. Packer*, 537 U.S. 3, 7-8 (2002). This "substantially higher threshold" focuses not on whether the state court was "incorrect, but on whether its determination was 'unreasonable.'" *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *see also Morrow v. Dretke*, 367 F.3d 309, 313 (5th Cir. 2004); *Foster v. Johnson*, 293 F.3d 766, 776 (5th Cir. 2002). To meet the AEDPA standard, "a state prisoner must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at ___, 131 S. Ct. at 786-87.

Federal courts likewise afford significant deference to a state court's factual determinations, presuming all factual findings to be correct. *See* 28 U.S.C. § 2254(e)(1),(2). A

petitioner may only rebut the presumption "by clear and convincing evidence." *Id.* Also, the "AEDPA generally prohibits federal habeas courts from granting evidentiary hearings when applicants have failed to develop the factual bases for their claims in state courts." *Schriro*, 550 U.S. at 474 (relying on 28 U.S.C. § 2254(e)(2)).

In addition to the AEDPA's stringent standards for relief, an inmate must comply with jurisprudential doctrines such as the harmless-error doctrine and the non-retroactivity principle. *See Horn v. Banks*, 536 U.S. 266, 272 (2002); *Thacker v. Dretke*, 396 F.3d 607, 612 n.2 (5th Cir. 2005). This Court cannot issue a habeas writ unless error "ha[d] a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Robertson*, 324 F.3d at 304 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993)); *see also Aleman v. Sternes*, 320 F.3d 687, 690-91 (7th Cir. 2003) ("Nothing in the AEDPA suggests that it is appropriate to issue writs of habeas corpus even though any error of federal law that may have occurred did not affect the outcome."). Also, under the jurisprudence flowing from *Teague v. Lane*, 489 U.S. 288 (1989), a habeas court cannot grant relief if it would require the creation and retroactive application of new constitutional law. *See Horn*, 536 U.S. at 272.

With those standards in mind, the Court turns to Bible's grounds for relief.

## ANALYSIS

### I.      The Death Penalty (claim 1(b))

Bible argues that capital punishment violates the evolving standards of decency that mark a progressing society. *See Trop v. Dulles*, 356 U.S. 86, 101 (1958). Bible cites nationwide trends in capital punishment, emphasizing a decline in the number of death sentences handed down, in the executions carried out, and in those States condoning death as a sentencing option.

According to Bible, polling data over a twenty year period shows a marked drop in support for the death penalty among Americans. Worldwide, he observes that many civilianized nations have rejected capital punishment. Taken together, Bible alleges that a nationwide, and worldwide, consensus has formed against the death penalty. Based on this emerging trend, Bible argues that the death penalty is *per se* unconstitutional.

The Supreme Court has never held that the death penalty itself, rather than the means to impose it or mechanisms to carry it out, violates the constitution. In *Furman v. Georgia*, 408 U.S. 238, 256-57 (1972), the Supreme Court held that the Georgia and Texas capital sentencing schemes ran afoul of the Eighth and Fourteenth Amendments because they allowed a sentencer unguided discretion. In response, the Texas legislature adopted a new capital sentencing procedure that required the jury to answer special issue questions in a hearing that followed a capital-murder conviction. In the decades that have followed *Furman*, the Supreme Court has found various aspects of a State's death penalty scheme unconstitutional. But a majority of the Court has never questioned the overall legitimacy of capital punishment.

Importantly, the Supreme Court in *Gregg v. Georgia*, 428 U.S. (1976), held that the death penalty is not *per se* unconstitutional. Since *Gregg*, the Supreme Court has reiterated that the death penalty itself does not violate the United States Constitution. *See Kennedy v. Louisiana*, 554 U.S. 407, 420 (2008) ("[T]he death penalty is not invariably unconstitutional[.]"); *Baze v. Rees*, 553 U.S. 35, 47 (2008) ("[C]apital punishment is constitutional."). Given the settled Supreme Court precedent establishing the constitutionality of capital punishment, the state habeas court's rejection of Bible *per se* constitutional challenge was not contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

## II.    Future Dangerousness (claims 1(a), 2, 7, and 8)

Even if a State's choice to employ the death penalty complies with constitutional expectations, Bible challenges the jury's prediction of his future violence in deciding whether to impose a death sentence.  In response to *Furman*, Texas established a new sentencing procedure which asks the jury to answer, among other questions, whether "there [is] a probability that the defendant . . . would commit criminal acts of violence that would constitute a continuing threat to society?"  Clerk's Record at 200; TEX. CODE CRIM. PRO. 37.071 §2(b)(1).  This interrogatory, frequently called the future-dangerousness special issue, requires jurors to predict an inmate's future behavior.   A Texas jury may consider several factors in assessing a defendant's prospective danger, including:

1.    the circumstances of the capital offense, including the defendant's state of mind and whether he was working alone or with other parties;

2.    the calculated nature of the defendant's acts;

3.    the forethought and deliberateness exhibited by the crime's execution;

4.    the existence of a prior criminal record, and the severity of the prior crimes;

5.    the defendant's age and personal circumstances at the time of the offense;

6.    whether the defendant was acting under duress or the domination of another at the time of the offense;

7.    psychiatric evidence; and

8.    character evidence.

*Walbey v. State*, 926 S.W.2d 307, 311 (Tex. Crim. App. 1996); *see also Devoe v. State*, 354 S.W.3d 457, 461-62 (Tex. Crim. App. 2011); *Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987).  "Often, the circumstances of the crime provide greater probative evidence of a

defendant's probability for committing future acts of violence than any other factor relevant to the future dangerousness special issue." *Dewberry v. State*, 4 S.W.3d 735, 741 (Tex. Crim. App. 1999). In fact, "the facts of the offense alone may be sufficient to sustain the jury's finding of future dangerousness." *Martinez v. State*, 327 S.W.3d 727, 730 (Tex. Crim. App. 2010); *see also Fuller v. State*, 253 S.W.3d 220, 231–32 (Tex. Crim. App. 2008); *Sonnier v. State*, 913 S.W.2d 511, 517 (Tex. Crim. App. 1995).

Texas' reliance on a jury finding of future dangerousness is not unique; "a defendant's future dangerousness bears on all sentencing determinations made in our criminal justice system." *Simmons v. South Carolina*, 512 U.S. 154, 162 (1994); *see also California v. Ramos*, 463 U.S. 992, 1006 (1983). Prosecutors in States that impose the death penalty "frequently emphasize a defendant's future dangerousness in their evidence and argument at the sentencing phase; they urge the jury to sentence the defendant to death so that he will not be a danger to the public if released from prison." *Simmons*, 512 U.S. at 163. Given that general acceptance of future dangerousness as a sentencing consideration, the Supreme Court has upheld Texas' reliance on a jury's finding of future societal threat:

> It is, of course, not easy to predict future behavior. The fact that such a determination is difficult, however, does not mean that it cannot be made. Indeed, prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system. The decision whether to admit a defendant to bail, for instance, must often turn on a judge's prediction of the defendant's future conduct. And any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose. For those sentenced to prison, these same predictions must be made by parole authorities. The task that a Texas jury must perform in answering the statutory question in issue is thus basically no different from the task performed countless times each day throughout the American system of criminal justice. What is essential is that the jury have before it all possible relevant

information about the individual defendant whose fate it must determine. Texas law clearly assures that all such evidence will be adduced.

*Jurek v. Texas*, 428 U.S. 262, 274-76 (1976).

Bible raises three specific challenges to Texas' future-dangerousness inquiry in this case. First, Bible contends that insufficient evidence supported his death sentence (claim 8). Bible also complains that the Texas Court of Criminal Appeals does not engage in a fulsome review of a jury's capital sentencing decision (claim 2a, 7). Finally, Bible claims that circumstances since his sentencing have permanently rendered him no longer a threat to society (claim 1a).

### A.      The Jury's Finding of Future Dangerousness (claim 8)

Bible argues that the prosecution's evidence of future dangerousness was legally insufficient to support the jury's verdict because he will never re-enter free society. Bible was fifty-one years old at sentencing. Even if he had received a life sentence and eventually secured parole in the instant case, authorities would then transfer him to custody in Louisiana where he had already received a life-without-parole sentence. Bible, therefore, argues that the jury's consideration of future dangerousness should only focus on threat he posed to prison society. Because he had only minor, nonviolent disciplinary infractions during previous lengthy incarcerations and his "criminal acts of violence - including the primary offense giving rise to his conviction - had all been directed at defenseless women and children," Bible asserted that he posed little threat in prison. (Docket Entry No. 5 at 106). Bible, therefore, argues that insufficient evidence supported the jury's answer to the future-dangerousness special issue.

Under *Jackson v. Virginia*, 443 U.S. 307 (1979), a reviewing court affirms a jury's decision if, when considering all of the evidence in a light most favorable to the prosecution, any

rational trier of fact could have returned a verdict unfavorable to the defendant. This demanding inquiry is highly deferential to, and resolves any conflicting evidence in favor of, the jury's verdict. *See United States v. Harris*, 293 F.3d 863, 869 (5th Cir. 2002); *United States v. Duncan*, 919 F.2d 981, 990 (5th Cir. 1990). The AEDPA augments the deferential *Jackson* analysis, creating a doubly high barrier to federal habeas relief. *See Coleman v. Jackson*, ___ U.S. ___, 132 S. Ct. 2060, 2062 (2012); *Perez v. Cain*, 529 F.3d 588, 599 (5th Cir. 2008). A federal court questions only whether the state court's assessment of the already-strict *Jackson* standard was unreasonable. Together, *Jackson* and the AEDPA create a "double dose of deference that can rarely be surmounted." *Boyer v. Belleque*, 659 F.3d 957, 964 (9th Cir. 2011).

Bible raised his *Jackson* claim on direct appeal. Rejecting Bible's focus on behavior while incarcerated, the Court of Criminal Appeals considered the term "society" in the future-dangerousness issue to mean "both prison and non-prison populations." *Campbell v. State*, 910 S.W.2d 475, 480 n.9 (Tex. Crim. App. 1995); *see also Morris v. Texas*, 940 S.W.2d 610, 613 (Tex. Crim. App. 1996).[6] With that understanding, the appellate court observed that Bible's "[g]ood behavior in prison does not preclude a finding of future dangerousness." *Bible*, 162 S.W.3d at 246. The Court of Criminal Appeals held that the "record of this case is littered with . . . evidence [of Bible's future danger to society], specifically, evidence of [his] numerous violent offenses." *Id.* at 245. The Court of Criminal Appeals summarized the State's punishment-phase evidence:

---

[6] The Supreme Court has stated that when imposing the death sentence, a review of a defendant's "significant criminal record, if any, and the range and severity of his prior criminal conduct" should be conducted. *See Jurek*, 428 U.S. at 271. The expansive sentencing review should include "all possible relevant information about the individual defendant[.]" *Id*. at 263. Here, the jury heard evidence about Bible's conduct before and during his incarceration. *See Skipper v. South Carolina*, 476 U.S. 1, 5 (1986) (Powell, J., dissenting) (noting that "[c]onsideration of a defendant's past conduct as indicative of his probable future behavior is an inevitable and not undesirable element of criminal sentencing"); *see also Jurek*, 428 U.S. at 274.

After raping and killing [the victim], [Bible] fled to Montana and Wyoming, where he developed an abusive relationship with a woman, who finally left [Bible] because of the constant violence directed toward her. [Bible] ground his knee into her ear, punched her in the face so hard that she was required to get stitches, poured gasoline onto her vehicle and set it on fire, and attacked her vehicle with an axe while a three-year-old child was inside.

After that relationship ended, [Bible] went to Weatherford, where he murdered his sister-in-law Tracy Powers, her infant son Justin Powers, and Tracy's roommate Pam Hudgins. He then fled back to Montana, where he kidnapped a young woman and an eleven-year-old girl, and he raped the girl. On August 3, 1984, [Bible] pled guilty to the Pam Hudgins's murder and was sentenced to twenty-five years in prison. He also pled guilty to two aggravated kidnappings he committed in Montana. He was later placed on parole, and he moved to Texas, where he sexually assaulted his five nieces (children of various ages) numerous times.

Finally, on November 7, 1998, while in Louisiana, [Bible] compelled Tera Robinson to submit to a sexual assault under threat of death. After the sexual assault, [Bible] tied Robinson up. She told [Bible] that her boyfriend was coming home soon and that [Bible] needed to leave. Before leaving the scene, he tried without success to stuff Robinson into a duffel bag.

[Bible] has killed four people, including an infant. He has sexually assaulted numerous others and might have killed his latest victim if he had succeeded in stuffing her into a duffel bag. There was ample evidence from which a rational jury could conclude that [Bible] posed a future danger to society, whether inside or outside prison.

*Bible*, 162 S.W.3d at 245-46.

The future dangerousness issue broadly addresses a defendant's current unlawfulness, the threat he poses while incarcerated, and any hypothetical danger if released decades later at an advanced age. The Court of Criminal Appeals considered the evidence before the jury and, applying *Jackson*, found sufficient evidence that Bible posed a threat in or outside the prison population. Given his extremely violent past, and in light of his continued aggression in the decades after the murder for which the jury convicted him, the Court of Criminal Appeals was

not unreasonable in finding that a reasonable jury could find that Bible would pose a future threat to society.  *See* 28 U.S.C. § 2254(d)(1).

### B.  Appellate Consideration of the Jury's Answers to the Special Issues (claim 7)

Bible's seventh claim asserts that the Court of Criminal Appeals unconstitutionally restricted its review into the sufficiency of the evidence.  In some cases prior to 2010, Texas engaged in a sufficiency-of-the-evidence review broader than that required by *Jackson*.  In addition to inquiring whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," what became known as the *Clewis* standard asked whether the verdict was "so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996).  Texas, however, derived that review exclusively from state law.  *See Woods v. Cockrell*, 307 F.3d 353, 358 (5th Cir. 2002) ("The *Clewis* standard is rooted in the Texas constitution.").  The Court of Criminal Appeals has since abolished the *Clewis* factual sufficiency review, applying only the *Jackson* standard in deciding whether sufficient evidence was presented at trial.  *See Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010).

The Court of Criminal Appeals did not apply *Clewis* to Bible's insufficiency-of-the-evidence-claim. Bible argues that Texas' choice not to employ *Clewis* violated his right to meaningful appellate review.[7]  "[M]eaningful appellate review of death sentences is fundamental to the constitutional application of death penalty statutes."  *Martinez v. Johnson*, 255 F.3d 229, 242 n. 17 (5th Cir. 2001) (citing *Parker v. Dugger*, 498 U.S. 308, 321 (1991)).  "The Supreme

---

[7] Bible filed a pre-trial motion arguing that "the capital murder sentencing scheme, as interpreted by the Texas Court of Criminal Appeals, is unconstitutional because there is no meaningful appellate review of the special issues which determine the infliction of the death penalty."  Clerk's Record at 68.  The trial court summarily denied that motion. Tr. Vol. 14 at 3.

Court requires that a jury's determination that a death sentence should issue must be guided by standards and reviewed by appellate courts to determine its propriety and non-arbitrariness." *Moore v. Johnson*, 225 F.3d 495, 505-06 (5th Cir. 2000). Particularly given the contested nature of the evidence in capital cases, Bible argues that the Court of Criminal Appeals' use of the prosecution-friendly *Jackson* standard alone is essentially "no review at all." (Docket Entry No. 5 at 103).

Even when the *Clewis* standard was in effect, however, the Court of Criminal Appeals refused to apply that review to the special issue questions. *See Allen v. State*, 108 S.W.3d 281, 285 (5th Cir. 2003). The Court of Criminal Appeals observed that

> [w]hile the future dangerousness issue is not wholly normative in nature, the issue is highly subjective because it calls for a prediction of future events rather than an assessment of events that have already occurred. Such predictions are necessarily value-laden, and whether a particular circumstance tends to increase or reduce the likelihood of future violence is a question whose answer will vary widely from one individual to the next, depending at least in part upon the individual's values and experiences.

*McGinn v. State*, 961 S.W.2d 161, 169 (Tex. Crim. App. 1998). Because a *Clewis* review "would necessarily assign some circumstances aggravating impact and other circumstances mitigating impact," a factual sufficiency review would intrude on the jury's discretion by requiring a court to "make its own determination of whether a circumstance carried mitigating, aggravating, or no weight, the result being that [it] would substitute [its] own determination of whether evidence is mitigating or aggravating for that of the jury." *Id.*; se*e also Williams v. State*, 270 S.W.3d 112, 138 (Tex. Crim. App. 2008).

Here, the Court of Criminal Appeals used the federally mandated *Jackson* standard when reviewing the evidence supporting the jury's decision that Bible would be a future societal

danger. Texas' creation of the *Clewis* standard was a matter of state law; no right to a factual view of a jury's sentencing review exists under United States Constitution. *See Schrader v. Whitley*, 904 F.2d 282, 284 (5th Cir. 1990) ("[I]n challenges to state convictions under 28 U.S.C. § 2254, only *Jackson* need be satisfied, even if state law would impose a more demanding standard of proof."). The Fifth Circuit has observed that federal courts "cannot impose a Texas constitutional standard for the factual review of the elements of a crime on the state [sic] courts of appeals when reviewing the issue of a defendant's future dangerousness. Neither [can they] adopt other than the federal standard." *Woods*, 307 F.3d at 358. Because no Supreme Court precedent requires state courts to engage in a factual-sufficiency review of sentencing determinations, the Court of Criminal Appeals' rejection of Bible's seventh claim was not contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

### C.    Bible's Current Threat (claims 1(a) 2(a))

Bible argues that he no longer threatens society. Less than a month after the jury found that fifty-one-year-old Bible would be a continuing threat, he experienced disabling injuries in an automobile accident. As prison guards transported Bible from the county jail facility to death row in Livingston, Texas, the prison van collided head-on with another vehicle. The driver of the prison van died. State Habeas Record at 73. Bible was seriously injured, experiencing a spinal fracture at the seventh cervical vertebra and persistent tachycardia. After several surgeries and a lengthy hospital stay, Bible finally entered death row. According to the pleadings, Bible experienced nerve damage that has left his mobility impaired. He feels severe pain throughout his body. He cannot lift his arms without support, suffers severe headaches, regularly experiences blackouts, and has chronic exhaustion.

Given his current debilitating condition, Bible argues:

> It is not a matter of conjecture as to whether he no longer poses a threat but a matter of medical fact. This case holds the real potential, should [his] appeals fail . . . of an ironic and grotesque spectacle unfolding in the Texas death chamber: an elderly man, confined to a wheelchair, unable to use his legs or arms, hoisted out of his wheelchair and assisted onto the death gurney by prison guards, and then being executed, all because he was at some point in the past deemed to be a future danger to prison society.

(Docket Entry No. 5 at 24). With that background, Bible argues that habeas relief lies because his current circumstances conclusively exclude him from being a future danger. (claim 1(a)). Bible also argues that Texas' capital punishment scheme violates due process because it does not accommodate a post-judgment reassessment of future dangerousness. (claim 2(a)).

As an initial matter, Respondent challenges Bible's assertion that he will no longer pose a threat to society. Assuming that Bible's description of his current health is correct, Respondent argues that "there is no reason why a disabled individual cannot pose a future danger." (Docket Entry No. 15 at 22). More importantly, Respondent contends that the law does not require a post-sentencing reweighing of those factors contributing to a death sentence.

Requiring a *jury* to predict an inmate's future threat is a common feature in criminal sentencing. *See Jurek*, 428 U.S. at 275. However, the Supreme Court has never held that a death-row inmate is entitled to another future dangerousness determination several years after his sentencing. *See Hughes v. Dretke*, 160 F. App'x. 431, 437 (5th Cir. 2006) (finding that reasonable jurists would not debate whether the denial of relief would be appropriate when an inmate argues that "*post hoc* proof of good behavior in prison and a defendant's advanced age are sufficient reasons to set aside a jury verdict"). This Court cannot grant relief on these claims without creating a "new rule" of constitutional law, thereby violating the *Teague*'s non-

retroactivity principle. *See Teague*, 489 U.S. at 305–07. As this Court cannot reassess whether Bible poses a current or future threat based on his present physical condition, and certainly lacks power to impose that obligation on the state courts, habeas relief is not available based on Bible's current physical condition.

### D.     Clemency (claim 2(b))

Bible finally complains that Texas will not consider his changed physical condition in deciding whether or not clemency is appropriate. The Governor of Texas, based on a recommendation of the Board of Pardons and Paroles, may grant clemency. TEX. CONST., Art. IV, §11; TEX. CODE CRIM. PRO. art. 48.01. The Supreme Court has recognized that "'[c]lemency is deeply rooted in our Anglo-American tradition of law, and is the historic remedy for preventing miscarriages of justice where judicial process has been exhausted.'" *Harbison v. Bell*, 556 U.S. 180, 192 (2009) (quoting *Herrera v. Collins*, 506 U.S. 390, 411-12 (1993) (footnote omitted)). Under Texas procedure, an inmate facing execution may file a written application for a "reprieve from execution" or "commutation of death sentence to a sentence of life imprisonment . . . not later than the twenty-first calendar day before the execution is scheduled." 37 TEX. ADMIN. Code § 143.43(a), 143.57(b). The Texas Board of Pardons and Paroles then makes a non-binding recommendation to the Governor. The State of Texas Constitution grants to the Governor the sole power of granting clemency. TEX. CONST., Art. IV, § 11.

Clemency is not simply a matter of mercy, but is "the 'fail safe' in our criminal justice system." *Harbison*, 556 U.S. at 192 (quoting *Herrera*, 506 U.S. at 415). Some minimal due process safeguards apply to clemency procedures. *See Ohio Adult Parole Auth. v. Woodard*, 523

U.S. 272, 288–89 (1998) (O'Connor, J., concurring). But these requirements are slight: "Judicial intervention might, for example, be warranted in the face of a scheme whereby a state official flipped a coin to determine whether to grant clemency, or in a case where the State arbitrarily denied a prisoner any access to its clemency process." *Id*. at 289.

Texas law does not provide the State executive branch any direction in the clemency process. No law or administrative regulation guides the Board of Pardon and Paroles' decision whether to recommend commutation. Bible contends that this unfettered discretion violates the federal constitution's due process clause by "essentially permit[ting] a decision by 'coin flip' to death." (Docket Entry No. 5 at 10).

Respondent argues that Bible currently lacks standing to challenge Texas' clemency procedures.[8] Under Article III of the Constitution, a petitioner establishes standing to bring a claim after "suffer[ing] an 'injury-in-fact - an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent not conjectural or hypothetical[.]"

---

[8] When Bible raised this claim on state habeas review, the state court rejected his complaint on several grounds, including the lack of standing:

> 40.    The Court finds that as of March 30, 2009, there is no execution date scheduled for [Bible]; that [Bible] has not yet filed a petition with the Board of Pardons and Paroles requesting clemency for the instant offense; and that [Bible's] habeas complaint about the constitutionality of the Texas clemency proceedings is not ripe for review.

> 41.    The Court finds that [Bible] has not been denied access to Texas clemency procedures, and that any future recommendations of the Board of Pardons and Paroles are speculative prior to the filing of a clemency petition and the resulting action of the Board of Pardons and Paroles.

> 42.    The Court finds that [Bible] lacks standing to challenge the clemency procedures of the Texas Board of Pardons and Paroles based on the absence of a clemency petition by the applicant.

> . . .

> 12.    In the alternative, [Bible] fails to show that the Texas clemency procedures lack due process and are constitutionally infirm; [Bible] fails to show that his constitutional rights, pursuant to U.S. CONST. Amends. VIII and XIV have been violated. *See Faulder v. Texas*, 178 F.3d 343, 344-5 (5th Cir. 1999) (holding that procedures of Texas Board of Pardons and Paroles meet due process).

State Habeas Record at 402-03, 420. The Court of Criminal Appeals, however, refused to adopt the lower court's finding that Bible lacked standing.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Bible "does not have an execution date, and he has not filed a petition for executive clemency." *White v. Thaler*, 522 F. App'x 226, 235-36 (5th Cir. 2013). Because Bible has not yet given Texas' executive branch an opportunity to consider whether clemency would be appropriate, "his claims of injury based on any alleged constitutional defects in the clemency process [are] speculative." *Sepulvado v. La. Bd. of Pardons & Parole*, 114 F. App'x 620, 621-22 (5th Cir. 2004); *see also White*, 522 F. App'x at 235-36. As any harm from the alleged defects in Texas' clemency process has not yet - and may never - reach fruition, Bible lacks standing to litigate this claim.

The Court observes, however, that Bible does not make a strong showing that anticipated clemency proceedings will violate his constitutional rights. The judiciary has a "narrow role in the uniquely executive task of considering clemency[.]" *Tamayo v. Perry*, 553 F. App'x 395, 402 (5th Cir. 2014); *see also Faulder v. Texas Bd. of Pardons and Paroles*, 178 F.3d 343, 344–45 (5th Cir. 1999); *Moody v. Rodriguez*, 164 F.3d 893 (5th Cir. 1999). Bible "d[oes] not provide evidence that he would be denied access to the [clemency] process or evidence that the decision will be made arbitrarily." *Roach v. Quarterman*, 220 F. App'x 270, 275 (5th Cir. 2007). Bible has not made a showing that would call into question the Fifth Circuit's previous caselaw upholding the constitutionality of Texas' clemency process. Accordingly, Bible's challenges to Texas' clemency proceedings are not an adequate basis for federal habeas relief.

## III.     Ineffective Assistance of Trial Counsel (claim 3)

Bible raises five challenges to trial counsel's representation. Bible contends that trial counsel provided constitutionally ineffective representation by (1) failing to argue that the State exercised preemptory challenges based on race; (2) not objecting to prejudicial punishment phase

evidence; (3) not challenging his confession to prior murders; (4) failing to present available mitigating evidence; and (5) arguing that extrinsic factors would cushion the jury's verdict. In reviewing a trial attorney's efforts, courts use the framework established in *Strickland v. Washington*, 466 U.S. 668 (1984), that asks whether "a defense attorney's *performance* f[ell] below an objective standard of reasonableness and thereby *prejudice[d]* the defense." *Yarborough v. Gentry*, 540 U.S. 1, 4 (2003) (emphasis added); *see also Wiggins v. Smith*, 539 U.S. 510, 520 (2003). In evaluating counsel's performance, "[j]udicial scrutiny . . . must be highly deferential" because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689. Thus, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* A court measures prejudice by asking if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Lafler v. Cooper*, ___ U.S. ___, 132 S. Ct. 1376, 1384 (2012) (quoting *Strickland*, 466 U.S. at 694).

The state courts adjudicated each of Bible's ineffective-assistance-of-trial-counsel claims on the merits. While "[s]urmounting *Strickland*'s high bar is never an easy task," a habeas petitioner's duty to "[e]stablish[] that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,'. . . and when the two apply in tandem, review is 'doubly so.'" *Richter*, ___ U.S. at ___, 131 S. Ct. at 788; *see also Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). When a petitioner brings a *Strickland* claim

under the AEDPA, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Richter*, ___ U.S. at ___, 131 S. Ct. at 785. The Court will consider whether Bible has met the AEDPA standard with regard to each of his *Strickland* claims.

## A.    *Batson*

On state habeas review, Bible argued that trial counsel should have challenged the State's use of four peremptory strikes under *Batson v. Kentucky*, 476 U.S. 79 (1986). Under *Batson*, the prosecution violates the equal protection clause when it strikes potential jurors solely on the basis of race. When a party raises a *Batson* challenge, courts engage in a three-step burden shifting review:

> First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. Although the prosecutor must present a comprehensible reason, the second step of this process does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices. Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. This final step involves evaluating the persuasiveness of the justification proffered by the prosecutor, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.

*Rice v. Collins*, 546 U.S. 333, 973-74 (2006) (quotations and citations omitted); *see also Johnson v. California*, 545 U.S. 162, 168 (2005); *Miller-El v. Dretke*, 545 U.S. 231, 251-52 (2005).

On federal review, Bible narrows his briefing about *Batson* violations to only two prospective jurors: Bonita Bledsoe Tolbert and Lana Carter Samuel. Because trial counsel never made a *Batson* objection, the parties did not develop a trial record exploring why the prosecution

struck those potential jurors. The two trial prosecutors (Kelley Siegler and Craig Goodhart) both provided affidavits on state habeas review responding to Bible's allegation that racial bias informed their use of strikes. Ms. Siegler explained that "[t]he race of . . . Samuel and Tolbert had absolutely nothing to do with my decision to exercise peremptory strikes against them. Based on their overall voir dire I did not think that they would be strong jurors for the State." State Habeas Record at 386. Ms. Siegler provided several reasons why the State found those two jurors unacceptable:

> After reviewing the transcript of my voir dire examination of Samuel it is apparent to me why I struck her. Samuel said that she always wanted to be a defense attorney and believed that the verdict in the O.J. Simpson case was just. She also stated that she tended to be more compassionate and sympathetic in her thinking which might sway her towards giving a life sentence. When asked about her feelings regarding the death penalty on a scale from one to ten, ten being most in favor for the death penalty and one being least in favor of the death penalty Samuel stated she was a nine. Based on her previous responses, I questioned her about whether she might be confused and if she was really a two, and she then stated she would be in the middle. I did not think that Samuel was being completely candid in her answers, and her responses made me think that she would be hesitant to return a death penalty.

> Prosecutor Craig Goodhart conducted the voir dire examination of prospective juror Bonita Bledsoe Tolbert while I was present and observed. Tolbert stated that she had been previously opposed to the death penalty. When asked if she would keep the death penalty if it were her decision, Tolbert responded "I think it would remain." Additionally, Tolbert responded in her questionnaire that she believed life imprisonment was more effective than the death penalty. Based on her responses, I did not think she would make a strong juror for the State. Prosecutor Goodhart and I discussed our strikes, and we both agreed that Tolbert was not a strong juror for the State based on her responses.

State Habeas Record at 385-86. The other prosecutor, Mr. Goodhart, provided greater insight into the strike against Tolbert:

I did not exercise a peremptory strike against Tolbert or any other prospective juror based on race.. . . . Bonita Bledsoe Tolbert stated that she had been previously opposed to the death penalty and that she believed that life imprisonment was more effective than the death penalty. When asked if she would keep the death penalty if it were her decision Tolbert responded, "I think it would remain." Tolbert also stated that she had visited a relative inside a prison, jail, or detention center. Additionally Tolbert's responses to the juror questionnaire conflicted with her responses during her voir dire examination. Tolbert, who was a labor attorney for the City of Houston, handled cases involving police officer discipline. As a general rule I do not like to have attorneys as jurors. Furthermore, since Tolbert dealt with the discipline of police officers, I believed she would have an issue with police officer credibility. Based on Tolbert's overall voir dire, I did not think that she would be a strong juror for the State.

Prosecutor Kelly Siegler and I discussed our strikes, and I indicated to Siegler that I did not think Tolbert would be a strong States juror based on her voir dire examination. Based on her observations, Siegler concurred.

State Habeas Record at 390-91.

Under *Batson* jurisprudence, the burden of proving purposeful discrimination rests with the person alleging the discrimination. *See Batson*, 476 U.S. at 93. On federal review, Bible parses through the two juror's statements to show inconsistencies or errors in the prosecutors' stated explanation. Bible brings his *Batson* claim, however, in the context of a *Strickland* ineffective-assistance-of-counsel claim. In his state habeas affidavit, trial counsel "disagree[ed] that any racial discrimination occurred." State Habeas Record at 379. Traditional habeas law honors trial counsel's opinion that racial concerns did not motivate the prosecution's challenges. *See Strickland* 466 U.S. at 689.

The AEDPA, however, adds a second layer of deference to trial counsel's perspective on the jury selection proceedings. *Burt v. Titlow*, ___ U.S. ___, 134 S. Ct. 10, 13 (2013) ("[O]ur cases require that the federal court use a doubly deferential standard of review that gives both the

state court and the defense attorney the benefit of the doubt.") (quotation omitted). "[B]ased on the credible affidavit of trial counsel," the state habeas court endorsed "trial counsel['s] disagree[ment] with [Bible's] habeas assertions of racial discrimination during jury selection[.]" State Habeas Record at 403. The state habeas court then went on to certify that each prosecutor's explanations for excusing the jurors were "race-neutral reasons." State Habeas Record at 420. Based on the trial prosecutors' explanations, and trial counsel's perception, the state habeas court found that Bible "fail[ed] to show that trial counsel's lack of a meritless *Batson* challenge constitutes ineffective assistance of counsel" and that he "fail[ed] to meet the two-prong *Strickland* test." State Habeas Record at 422.

The AEDPA presumes the state habeas court's explicit factual findings and legal conclusions to be correct unless a petitioner shows "clear and convincing evidence" in rebuttal. 28 U.S.C. § 2254(e)(1).[9] In arguing that the State had used pretexts for racism when explaining why they dismissed jurors, Bible scours the record for jurors who were not stricken but held somewhat-similar views to those who were. For example, the prosecutors removed Tolbert because she was "a labor attorney for the City of Houston [who] handled cases involving police officer discipline." "As a general rule [the prosecutors do] not like to have attorneys as jurors[,]" and more particularly in this case "since Tolbert dealt with the discipline of police officers [and the prosecutors] believed she would have an issue with police officer credibility." State Habeas Record at 391. Bible, however, argues that "[t]he State's assertion that they simply preferred non-attorney jurors is belied by the fact that [a seated juror] said he 'was real interested in the law and how it works'" and another "had a sister who was an attorney and had previously

---

[9] As the same judge presided over the jury selection proceedings and the state habeas action, and from that perspective found lack of merit to Bible's claim, the presumption of correctness is especially strong. *See Mays v. Stephens*, 757 F.3d 211, 214 (5th Cir. 2014); *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000).

prosecuted a death penalty . . . and himself demonstrated a clear understanding of critical principles of criminal law."  (Docket Entry No. 5 at 50).  Bible points to other jurors who he argues answered similarly to other issues, but the prosecution did not remove by peremptory strike.

Bible's arguments, however, do not amount to clear and convincing evidence that refutes the state court's finding that the State offered race-neutral reasons for the strikes.  Bible's other attempts to dispute the state court's factfindings similarly do not amount to clear and convincing evidence. As Respondent argues, notwithstanding Bible's comparisons between the stricken and serving jurors, the prosecution "had ample, non-discriminatory reasons for striking" the potential jurors.  (Docket Entry No. 15 at 51).  Given the state habeas court's fact findings, and the strong deference paid to trial counsel's performance, the state habeas court's rejection of Bible's ineffective-assistance based on *Batson* was not unreasonable.

### B.    The Prosecution's Punishment Phase Demonstration

During the punishment phase of trial, the State presented testimony and evidence concerning the sexual assault Bible committed that led to his arrest.  In his police statement, Bible admitted that he broke into Tera Robinson's Louisiana motel room, restrained her, and tried to stuff her into a duffle bag, but claimed that he did not specifically remember sexually assaulting her. The State played for the jury Bible's audiotaped confession.  When the State called Ms. Robinson to the stand, she testified that Bible

> forcibly pushed open her motel room door when she cracked it
> open after hearing a knock; that [Bible] grabbed her by the throat
> slammed her against the wall, and lifted her off the ground; that
> [Bible] threw her onto a bed, climbed on top of her, and pinned her
> down by straddling her and holding down her arms; that [Bible]
> ripped off her shirt and took off his pants and then straddled "her

over her chest" and forced his penis into her mouth; that [Bible] "slid down" Robinson after forcing her to perform oral sex on him and then forced his penis into her vagina; that [Bible] tied Robinsons ankles and wrists after sexually assaulting her; and that [Bible] attempted to stuff her into a duffle bag.

State Habeas Record at 407; Tr. Vol. 22 at 49-74.

As Ms. Robinson testified, the two prosecutors acted out the assault. The prosecutors' demonstration "comprised ten pages of Robinson's thirty-eight pages of testimony." State Habeas Record at 407. As Ms. Robinson described the attack, Ms. Siegler apparently lay down on the counsel table while Mr. Goodhart pinned her arms down with his knees, straddled her, and otherwise positioned himself as Bible did. Later during Ms. Robinson's testimony, Ms. Siegler replicated how she looked after Bible had tied her. Also, the prosecutors apparently also acted out Ms. Robinson's description of how Bible tried to stuff her into a duffle bag.

Trial counsel did not object to the in-court demonstration, though in his state habeas affidavit he said: "I wish I had[.]" State Habeas Record at 351. Even so, trial court did not think objecting would make any difference: "I doubt that the trial court would have sustained that objection and further doubt that the Court of Criminal Appeals would reverse a case based on that demonstration at a punishment hearing in a death penalty case." State Habeas Record at 351.

Bible claims that trial counsel provided ineffective representation by not objecting to the demonstration. Bible argues that "[t]he prosecutors' dramatic reenactment had no purpose except to inflame the passions of the jury. It was wholly unnecessary to assist the jury in visualizing the scene, or ascertaining the calculated nature of Bible's actions, the degree of force Bible used, or Bible's physical mastery of victim." (Docket Entry No. 5 at 61). Because the jury had already heard Bible's confession to some of the events, and Ms. Robinson's testimony filled

in any gaps, Bible argues that "the reenactment was either so conspicuously prejudicial or of such magnitude as to fatally infect the trial and deprive the defendant of due process[.]" (Docket Entry No. 5 at 61).

The state habeas court found no deficient performance by trial counsel. The state habeas court suggested that it would not have sustained any objection because the demonstration "logically assisted the jury in understanding and visualizing Robinson's testimony concerning [Bible's] actions, his degree of force, and Robinson's physical positions and helplessness during the attack." State Habeas Record at 408. In fact, the state habeas court concluded that the demonstration "was necessary to counter [Bible's] attempt to minimize the amount of force he used during the assault and his self-serving claim that he did not remember the assault and had been drinking heavily[.]" State Habeas Record at 422. Also, the "in-court demonstration was necessary and admissible to show [Bible's] calculated actions, his degree of force, and his physical mastery of Robinson." State Habeas Record at 422. Echoing the mechanics of TEX. R. CRIM. EVID. 403, the state habeas court stated "the probative value of the reenactment of [Bible's] rape of Robinson was not substantially outweighed by the danger of unfair prejudice, and any emotional and prejudicial aspects of the reenactment were substantially outweighed by the helpful aspects of the reenactment." State Habeas Record at 422.[10]

On federal habeas review, this Court's concern is not whether the prosecution's dramatic reenactment was proper under state rules of procedure, consistent with proper courtroom decorum, permissible in federal court, or in keeping with the prosecutor's solemn duty as officers

---

[10] Citing the lower court's conclusion of law number 19, Respondent argues that "even if counsel should have made an objection, the state habeas court noted that counsel could not have been ineffective 'in light of the nature of the instant offense and other extensive testimony of [Bible]'s violent prior history." (Docket Entry No. 15 at 58). The Court of Criminal Appeals, however, did not adopt that conclusion. As well, this Court does not adopt the conclusion(s) of the trial court. For the prosecutors in a case to inject themselves in the fact development by demonstration is alarming, to say the least. Such conduct is *extra jus*.

of the court. This Court's concern is whether the state court's adjudication was unreasonable, which requires Bible to show "that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at ___, 131 S. Ct. at 786-87. Here, Bible had confessed to attacking Ms. Robinson, but stopped short of admitting that he had sexually assaulted her. Ms. Robinson provided detailed testimony that adequately allowed jurors to understand the violence and brutality associated with the rape. While the prosecutors' theatrics possibly drew Bible's assault into sharper focus, Bible makes a good argument that the jurors already had before them the essential features of the episode.

Still, the state courts considered the evidentiary basis for Bible's proposed objection and essentially found that any objection would have been overruled. Importantly, the prosecutors' dramatization of the attack was superfluous and came before jurors in the midst of a highly prejudicial punishment phase. Jurors had to consider Bible's life-long violence which involved repeated murders and sexual assaults. Given Bible's unremitting violence, the state courts would not be unreasonable in finding no federal constitutional error in the prosecutors' demonstrative actions. Bible, therefore, has not shown that the state court's rejection of this claim was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. §2254(d)(1).

### C. Evidence Contradicting his Confession to Extraneous Offenses

Bible complains that trial counsel should have adduced evidence to prove that he falsely confessed to extraneous murders. After his arrest in Louisiana, Bible confessed to several crimes, including three murders he had committed fifteen years before. State Habeas Record at 446-62. As summarized by the habeas court, Bible told police officers that he had killed his wife's sister-in-law, her roommate, and a baby:

> [Bible said that he] raped [his wife's sister-in-law] Pam Hudgins,
> struck her several times with an object and left her body on a hill in
> 1983; that he returned to the [her] apartment afterwards where he
> argued with [her roommate] Tracy Powers who was holding her
> baby; that Powers fell down the stairs after [Bible] grabbed her and
> pushed her; that neither Powers nor her baby were moving or
> speaking after the fall; that [Bible] got an ice pick from the kitchen
> but claimed that he did not remember what he did with the ice
> pick; that he placed Powers' and the infant's bodies in a container
> and discarded the bodies on the side of a road between
> Weatherford and Mineral Wells [Texas]; and, that [Bible] left town
> and drove to Montana after Hudgins, Powers and her baby were
> reported missing.

State Habeas Record at 397. The prosecution put Bible's police statement before the jury in the punishment phase.

In 1984, Bible had pleaded guilty to the murder of Ms. Hudgins and received a twenty-five-year sentence. Bible's later police statements, however, were the only evidence connecting him to the other two murders. Bible had apparently told others that he did not actually commit the extraneous killings. Bible says that he only admitted to those murders in order to secure a plea deal in Louisiana. He excuses his knowledge of the crimes by claiming that he was only responding to leading questions by the interrogating officers.

In the guilt/innocence phase trial counsel argued that Bible had manufactured his confession to Mrs. Deaton's murder in order to secure a plea deal in Louisiana. Tr. Vol. 18 at 17-26. Bible claims that trial counsel should have extended that argument in the penalty phase to the other murders. Bible argues that "there was significant available evidence reinforcing the notion that Bible had made a false confession in order to cut a deal, and that the 1983 North Texas murders were actually attributable to someone else." (Docket Entry No. 5 at 65).

Bible, however, only points to one piece of evidence that would have supported his false-confession argument: a police report suggesting that authorities initially investigated whether

another man had committed those murders. A county sheriff's department created an "information report" while investigating the murder of Ms. Powers and her baby. One entry from the same day that the police discovered the bodies contains the following information:

Tuesday 2:36 PM (6-21-83)

> [Parker County Sheriff's] Deputy Moody spoke with Sheriff Conway of Montague County in reference to the skeletal remains found in Parker County, Texas at 11:45 AM 6/21/83. Sheriff Conway advised Deputy Moody that he believed that the female subject may have been the victim of a subject that he has in his jail at this time that as of Saturday 6/18/83 had confessed to 61 murders over the United States. Sheriff Conway went on to say he wanted to view the scene in person and possibly determine if this was a crime scene that the subject he has in jail talked about where the body had not been found.

> 3:43 PM Sheriff Conway arrived at the Parker County Sheriffs Office and he and Deputy Moody drove to the scene where the remains were found. Upon arrival Sheriff Conway looked over the scene and advised Deputy Moody that the scene was reasonably close to what the arrested suspect had described and that he would check further on who the victim may be.

Clerk's Record at 82-83. While the police never charged the other prisoner with the murders, Bible argues that trial counsel should have used the information report to play on any residual doubt held by jurors.

The state habeas court found that "[t]rial counsel cannot be considered ineffective for not pursuing and/or presenting evidence that, by its very nature, would lessen the credibility of counsel and not benefit [Bible]; trial counsel are not ineffective for choosing not to present a speculative, non-viable defense claim." State Habeas Record at 423-24. Because the police information report was introduced into evidence, Tr. Vol. 26, SX 72, the state habeas court found that the "jury was aware of the Montague County Sheriff's initial interest in the remains of an

unidentified person based on information received by a suspect in the Montague County jail." State Habeas Record at 409. "[N]owithstanding the initial interest," however, Bible "was conclusively linked to his admitted murders of Tracy Powers, Justin Powers, and Pam Hudgins." State Habeas Record at 410. Because trial counsel's "plausible strategy was to develop a rapport of honesty with the jury so that the jury would accept counsel's planned jury argument that a life sentence, when combined with [Bible's] Louisiana life without parole sentence, was sufficient to protect society," Bible's attorneys "reasonably believed that raising a disingenuous defense that someone else committed the admitted extraneous murders would jeopardize counsel's believability with the jury." State Habeas Record at 410. Bible's burden on federal habeas review is to show that that state court's adjudication was contrary to, or an unreasonable application of, federal law.

Bible has not argued that coercion or police overreaching caused him to craft an untrue story about killing Ms. Hudgins, Ms. Powers, and her baby. Trial counsel litigated a motion to suppress Bible's confessions. The testimony from the hearing did not raise any concern about the voluntariness of his police statements. The only evidence Bible raises to call his confession into question is a police report indicating that the police looked into other leads early in their investigation.

In assessing whether trial counsel should have emphasized the information report, the state courts applied governing Supreme Court precedent and found no constitutional error. The state habeas court was not unreasonable in finding that Bible's "plea of guilty to the murder of Pam Hudgins has a presumption of regularity and that any self-serving details in [his] confession regarding the murders of Hudgins, Tracy Powers, and her baby do not undermine [Bible's] admission of guilt and the evidence presented during the punishment phase of the [his] trial

concerning his commission of the extraneous murders." State Habeas Record at 410. Bible's disavowal of his confession is self-serving, as is his allegation that he only responded to leading questions from the police. Given the paucity of evidence that would discredit his confession to the three extraneous murders, the state courts were not unreasonable in finding that trial counsel did not provide deficient performance, and no actual prejudice flowed, from not attacking more vigorously his police statements.

### D.    Mitigating Evidence

Trial counsel called only one witness in the punishment phase. An ordained minister testified that during a forty-five minute conversation Bible had discussed spiritual matters and said that he had accepted Jesus Christ as his Savior and Lord. Tr. Vol. 22 at 83-86. Trial counsel also submitted into evidence records showing that Bible had completed religious correspondence courses. Bible argues that this brief punishment-phase case ignored "the most important available mitigating evidence" -- his military service records and his Veterans Affairs medical records. (Docket Entry No. 5 at 85).

The state habeas court reviewed trial counsel's efforts to prepare a mitigating defense: trial counsel "interviewed witnesses, talked with [Bible's] family about potential mitigating evidence, reviewed the State's files, employed the services of an investigator, employed a mitigation expert, and spoke with [Bible] numerous times about the facts, witnesses, his background, and any possible mitigating evidence." State Habeas Record at 411. Before presenting evidence in the penalty phase, trial counsel marked Bible's military records and V.A. medical records as defense exhibits. Trial counsel, however, did not want to publish those documents to the jury, but wanted to add them to the record "for appellate purposes only." Tr.

Vol. 22 at 81. Trial counsel explained that "[t]here are some things that are helpful to the defense in th[o]se records," but much that the "State was going to use" against the defense. Tr. Vol. 22 at 81.[11] Trial counsel did not take the decision to omit the records lightly. Trial counsel explained:

> [F]rankly, after (co-counsel) and I have talked about it at length for days, we decided that it is going to be more harmful than helpful to offer them. So, I am going to put them in the record and the writ lawyer or the direct appeal lawyer can look at that, make up their own mind whether we made a mistake or not; but it is our decision not to offer these.

Tr. Vol. 22 at 81.

Bible argued on state habeas review that trial counsel should have put the military and V.A. records into evidence. Bible submitted the records along with his habeas application. State Habeas Record at 83-200. Bible wished trial counsel had relied on those records to show that (1) he had been diagnosed with neurotic depression while in the military, tried to commit suicide, and was taking three prescription medications for schizophrenia before Ms. Deaton's murder; (2) he had given distinguished service in the military; and (3) he denied killing Ms. Hudgins even after serving time for her murder. State Habeas Record at 49-50.

Relying on trial counsel's explanation of why they did not admit the records, the state habeas court found that "[t]rial counsel are not ineffective for making the reasonable trial decision not to present [Bible's] military/veteran records" because the "records contain[ed] harmful information and contradictions" which were "more harmful than helpful" and so that "the mitigating value of any of the records would be lost." State Habeas Record at 424. The

---

[11] Trial counsel informed thr trial court that they had received a copy of the records from the State with "probably 50 at least" markers placed thereon which "represent matters that the State wants to publish about the defendant which are either untruths or very harmful to the defendant." Tr. Vol. 22 at 80-81.

state habeas court discussed the information in Bible's records that would be harmful to the defense:

- Bible had a "life-long history of low frustration with resulting impulsive behavior";
- he attempted suicide when his wife refused to engage in sexual relations and wanted a divorce;
- he abused his wife when his suicide attempt did not change her mind;
- he entered the military because he was "pissed off at home";
- he had a poor employment history before joining the military;
- he claimed to have received wounds in Vietnam, but never served there;
- while serving in the military he was charged with stealing a riot grenade and thereafter received a reduction in military grade;
- he was treated for psychological issues after being released from prison in 1992;
- he claimed to have smuggled guns and people across the border from Mexico;
- he physically assaulted an employer and stole money from him;
- he claimed to have been wrongfully convicted of crimes for which he had never been charged;
- he used cocaine and marijuana;
- he said that he had a "flashy" temper that caused him to strike people if they "catch him in a wrong mood";
- he fought at school and was expelled;
- he only attended one anger management class after referral;
- in 1992 he was diagnosed with a personality disorder with anti-social traits.

State Habeas Record at 411-12. Additionally, the records indicated that Bible showed no sign of psychosis in the months before Mrs. Deaton's murder. State Habeas record at 412.

On federal review, Bible renews his claim that trial counsel should have submitted the records into evidence. Bible raises three arguments to counter the state habeas court's findings. First, Bible challenges trial counsel's decision because, as the jury had already heard the worst of his violent criminal past, any negative information in the records would not necessarily harm his punishment case. Simply, "[b]ecause the damage was already overwhelmingly done, there was nothing contained within Bible's military or medical records which could make matters any worse." (Docket Entry No. 5 at 70). Second, Bible argues that the records must have been beneficial to the defense because the State chose not to present them. Finally, Bible argues that

trial counsel cannot have made a reasonable decision about the records because he otherwise presented "virtually *no* mitigating evidence." (Docket Entry No. 5 at 71-73).

Bible has not shown that the state habeas court was unreasonable in rejecting his claim. Bible does not argue that trial counsel left mitigating avenues unexplored or that he otherwise neglected to prepare for the punishment phase. Bible, in essence, contends that trial counsel's decision was unwise because much harmful information was already before the jury, thus dulling any aggravating effect from the records while allowing the jury to have more mitigating evidence.

Nevertheless, "[j]udicial scrutiny of counsel's performance must be highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. The Supreme Court has held that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable" *Pinholster*, ___ U.S. at ___, 131 S. Ct. at 1427 (quoting *Strickland*, 466 U.S. at 690); *see also Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009); *Garza v. Thaler*, 487 F. App'x 907, 911 (5th Cir. 2012). Trial counsel's strategy in the penalty phase was to convince the jury that, because of Bible's advanced age, the length of time before parole eligibility, and pending life sentence in Louisiana, he would live out his days in custody. Trial counsel tried to persuade jurors that he would not pose a future threat to free society.

Trial counsel presented some minimal mitigating evidence and decided not to present more. Yet *Strickland* does not "require defense counsel to present mitigating evidence at sentencing in every case." *Wiggins*, 539 U.S. at 533; *Smith v. Quarterman*, 515 F.3d 392, 405

(5th Cir. 2008) ("Trial counsel's failure to present mitigating evidence during the penalty phase is not *per se* ineffective assistance."). "[F]ailure to present mitigating evidence, if based on an informed and reasoned practical judgment, is well within the range of practical choices not to be second-guessed[.]" *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992). With trial counsel's investigation into the potential mitigating evidence, and assessment of the effect the challenged information would have at trial, the state habeas court was not unreasonable in finding that no deficient performance or actual prejudice resulted from trial counsel's strategic decision.

### D. Closing Argument

Bible argues that trial counsel's closing argument moved the jury toward answering the special issues in a manner resulting in a death sentence. During closing, trial counsel referred to Bible's age to persuade the jury that he would die in prison if given a life sentence. Trial counsel argued that, since Bible had already received a life sentence in Louisiana, a Texas life sentence would ensure that he would never pose a threat to free society. Trial counsel additionally argued: "The plain fact of the matter is he possibly cannot outlive the appellate process, even if you give him the death penalty. He probably won't live long enough for the final appeal to be filed." Tr. Vol. 23 at 29-30. Citing *Caldwell v. Mississippi*, 472 U.S. 320 (1985), Bible asserts that "the argument misled the jury to believe that even if they imposed the death sentence, the defendant would never actually be put to death. Such argument impermissibly diminishes the jury's duty by rendering the death sentence a more palatable option and, in doing so, undermines any confidence in the outcome of the punishment hearing." (Docket Entry No. 5 at 76).

In *Caldwell*, the Supreme Court held that the Eighth Amendment prohibits resting "a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id.* at 328-29; *see also Wright v. West*, 505 U.S. 277, 312 (1992). "*Caldwell* is relevant only to certain types of comments - those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." *Darden v. Wainwright*, 477 U.S. 168, 183 n.15 (1986); *see also Romano v. Oklahoma*, 512 U.S. 1, 8 (1994) (finding that *Caldwell* prohibits the prosecution from misleading the jury regarding the role it plays in the sentencing decision). To "establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Dugger v. Adams*, 489 U.S. 401, 407 (1989).

The state habeas court found that "unlike the prosecutor's improper argument in *Caldwell*, trial counsel's punishment argument was not urging the jury to abdicate its responsibility and was not an attempt to place the responsibility for [Bible's] sentence on an appellate court," but "instead counsel's instant argument was an attempt to convince the jury that life rather that death was an appropriate sentence." State Habeas Record at 414. The state habeas court's rejection of this claim was not unreasonable. Trial counsel did not ask jurors to abandon their role and did not mischaracterize their weighty responsibility. Trial counsel's rhetoric instead responded to the State's plea for a death sentence and attempted to convince jurors that the circumstances would not permit Bible to threaten free society. Even so, the trial court instructed jurors to consider only the evidence in their decision-making, lessening the impact of any rhetoric. The Court presumes that jurors followed that instruction. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

Given the fact that the jury instructions properly informed jurors of their duty, and trial counsel did not ask them to abdicate their responsibility, Bible has not shown that the state habeas court was unreasonable in finding no deficient performance in trial counsel's closing argument.

## IV.    Ineffective Assistance of Appellate Counsel (claim 4)

Bible alleges that his appellate counsel should have argued that the trial court erred by refusing to instruct jurors on a lesser offense.  The State charged Bible with capital murder for intentionally causing the victim's death during the course of an aggravated rape.  Clerk's Record at 2.  At the close of evidence, trial counsel argued that the evidence would not allow the jury to find that Bible had sexually assaulted Ms. Deaton.  Trial counsel specifically stated:

> We are going to request a charge on the lesser included offense of murder because the evidence is insufficient to prove conclusively that this defendant raped this woman or attempted to rape this woman *because of the absence of DNA testimony*.  So we think we are entitled to a charge on the lesser included offense of murder.

Tr. Vol. 17 at 84 (emphasis added).  The trial court denied that request.  Tr. Vol. 17 at 84.

The Supreme Court held in *Beck v. Alabama*, 447 U.S. 625 (1980) that a State cannot impose a categorical bar on giving lesser-included-offense instructions in capital cases.[12]

---

[12] *Beck* specifically criticized an all-or-nothing policy where a jury faced only two choices: either convict a defendant of a capital crime or release him into society.  *See Schad v. Arizona*, 501 U.S. 624, 647 (1991); *Spaziano v. Florida*, 468 U.S. 447, 455 (1984).  Some question whether Texas' post-*Furman* capital procedure implicates the same concerns present in *Beck*. *See Howell v. Mississippi*, 543 U.S. 440, 445 (2005) (finding that limiting *Beck* "finds some support in [Supreme Court] cases"); *Hopkins v. Reeves*, 524 U.S. 88, 98-99 (1998) (distinguishing *Beck* from those cases where the jury "did not have to consider the dilemma faced by Beck's jury; its alternative to death was not setting respondent free, but rather sentencing him to life imprisonment"); *Schad*, 501 U.S. at 646 ("Our fundamental concern in *Beck* was that a jury . . . might . . . vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all").  Because the Fifth Circuit, however, has avoided ruling on this argument, *see Foster v. Dretke*, 2006 WL 616980 (5th Cir. Mar. 13, 2006) (unpublished), and Texas has unconditionally applied *Beck* to all inmates who have received a death sentence, the Court will apply *Beck* to Bible's claim.

"Subsequent decisions by [the Fifth Circuit] have consistently held that a state trial court may not, under *Beck*, refuse a lesser-included-offense instruction 'if the jury could rationally acquit on the capital crime and convict for the noncapital crime.'" *East v. Scott*, 55 F.3d 996, 1005 (5th Cir. 1995) (internal citation omitted) (quoting *Cordova v. Lynaugh*, 838 F.2d 764, 767 (5th Cir. 1988)). "In deciding whether a jury could rationally acquit on the capital crime and convict for the noncapital crime, [this court] must turn to Texas law." *East*, 55 F.3d at 1005.

Two factors entitle a Texas defendant to a lesser-included-offense instruction. First, "the proof for the offense charged includes the proof necessary to establish the lesser-included offense." *Hall v. State*, 225 S.W.3d 524, 536 (Tex. Crim. App. 2007) (quotation omitted). Second, there must be "some evidence in the record that would permit a jury rationally to find that if the defendant is guilty, he is guilty *only* of the lesser-included offense." *Id.* (quotation omitted and emphasis added); *see also Aguilar v. Dretke*, 428 F.3d 526, 531 (5th Cir. 2005) ("A defendant is entitled to the instruction if the jury could rationally acquit the defendant on the capital crime and convict on the non-capital crime.") (relying on *Beck*, 447 U.S. at 637).

Bible does not raise an independent *Beck* claim, but instead argues that appellate counsel should have raised one before the Texas Court of Criminal Appeals. "In reviewing a claim alleging ineffective assistance of appellate counsel [courts] apply the traditional *Strickland* standard." *Blanton v. Quarterman*, 543 F.3d 230, 240 (5th Cir. 2008); *see also Henderson v. Quarterman*, 460 F.3d 654, 665 (5th Cir. 2006); *Amador v. Quarterman*, 458 F.3d 397, 410 (5th Cir. 2006). An inmate challenging his appellate counsel's selection of claims must show both deficient performance and that "the outcome of the appeal would have been different." *Amador*, 458 F.3d at 410; *Pitts v. Anderson*, 122 F.3d 275, 279 (5th Cir. 1997); *Sharp v. Johnson*, 107 F.3d 282, 286 n. 9 (5th Cir. 1997).

In applying those standards, an appellate attorney cannot be faulted for not raising meritless claims. *See United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument thus cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue."). "Failure to raise meritless objections is not ineffective lawyering; it is the very opposite." *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994); *see also Green v. Johnson*, 160 F.3d 1029, 1037 (5th Cir. 1998) ("[F]ailure to make a frivolous objection does not cause counsel's performance to fall below an objective level of reasonableness[.]"). "The process of 'winnowing out weaker arguments . . . and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate [and habeas] advocacy." *Smith*, 477 U.S. at 536 (quoting *Jones*, 463 U.S. at 751).

As an initial matter, Respondent suggests that Bible has fundamentally changed the legal and factual focus of his claim from that he advanced in state court, rendering it unexhausted and procedurally barred. (Docket Entry No. 15 at 84). Respondent alternatively asserts that Bible's ineffective-assistance claim lacks merit. The Court will first consider the merits of the procedural arguments before turning to an alternative review of the merits.

### A.      Exhaustion of Remedies

An inmate must present all habeas claims in state court before seeking federal relief. *See* 28 U.S.C. § 2254(b). The exhaustion doctrine affords the state courts the first opportunity "to address and correct alleged violations of state prisoner's federal rights." *Coleman v. Thompson*, 501 U.S. 722, 731 (1991). "'[W]here petitioner advances in federal court an argument based on a legal theory distinct from that relied upon in the state court, he fails to satisfy the exhaustion

requirement.'" *Bagwell v. Dretke*, 372 F.3d 748, 755 (5th Cir. 2004) (quoting *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001)); *see also Tarver v. Banks*, 541 F. App'x 434, 437 (5th Cir. 2013); *Ruiz v. Quarterman*, 460 F.3d 638, 643 (5th Cir. 2006). A comparison of Bible's federal and state ineffective-assistance claims indicates that he did not give the state courts an opportunity to consider his federal arguments.

In his state habeas application, Bible alleged that "[a]n instruction on the lesser-included offense of murder was clearly warranted in this case because there was certainly some evidence which raised a question of whether [Mrs. Deaton] *was in fact raped*[.]" State Habeas Record at 56 (emphasis added). Trial counsel had asked the trial court for an instruction on simple murder because "the evidence is insufficient to prove conclusively that this defendant raped this woman or attempted to rape this woman because of the absence of DNA testimony." Tr. Vol. 17 at 84. State habeas counsel specifically relied on trial counsel's objection to allege that appellate counsel should have raised a *Beck* claim. State Habeas Record at 55-57.

Bible renews his argument that the trial court should have given a lesser-included instruction, but for reasons different from those he discussed on state habeas review. On federal review, Bible concedes that he confessed to raping Ms. Deaton. (Docket Entry No. 5 at 83). Bible now argues that the trial court should have instructed jurors on simple murder because the evidence would not allow a rational jury to find that he intentionally killed Mrs. Deaton. Bible emphasizes that he could not remember details about the actual murder in his police statement, giving rise to speculation about whether he meant to end Ms. Deaton's life. Because Bible advances a legally and factually distinct claim from the one he presented in state habeas court, he has not exhausted his federal ineffective-assistance-of-counsel/*Beck* claim.

### B.   Procedural Bar

An inmate who files a federal petition containing unexhausted claims usually cannot return to state court because Texas' abuse-of-the-writ doctrine (codified at TEX. CODE CRIM. PRO. art. 11.071 §5) stringently limits successive state habeas actions.  "A procedural default . . . occurs when a prisoner fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'"  *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997) (quoting *Coleman*, 501 U.S. at 734 n.1); *see also Steele v. Young*, 11 F.3d 1518, 1524 (10th Cir. 1993) (holding that when "it is obvious that the unexhausted claim would be procedurally barred in state court, we will forego the needless 'judicial ping-pong' and hold the claim procedurally barred from habeas review").  As the Texas courts would not allow Bible to raise his enhanced federal clam in a successive state habeas application, a procedural bar forecloses federal review.

A federal petitioner may overcome the default of his claims if he can "demonstrate *cause* for the default and *actual prejudice* as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a *fundamental miscarriage of justice*."  *Coleman*, 501 U.S. at 750 (emphasis added).  Bible summarily asserts that "such default must be excused under *Martinez v. Ryan*[.]"  (Docket Entry No. 5 at 84 n.28).  In *Martinez v. Ryan*, ___ U.S. ___, 132 S. Ct. 1309, 1320 (2012), the Supreme Court recently found that ineffective assistance by a state habeas attorney may amount to cause under some circumstances.  *See Trevino v. Thaler*, ___ U.S ___, 133 S. Ct. 1911 (2013) (applying *Martinez* to cases arising from Texas courts).  To meet the cause exception under *Martinez*, an inmate must: (1) prove that his habeas attorney's representation fell below the standards established in

*Strickland* and (2) show that his underlying ineffective-assistance claim "has some merit[.]" *Martinez*, ___ U.S. at ___, 132 S. Ct. at 1318; *see also Crutsinger v. Stephens*, 540 F. App'x 310, 317 (5th Cir. 2013); *In re Sepulvado*, 707 F.3d 550, 556 n. 12 (5th Cir. 2013).

As an initial matter, neither the Supreme Court nor Fifth Circuit has extended the *Martinez* exception to ineffective-assistance-of-*appellate*-counsel claims. *Martinez* announced a "narrow exception" that applies only with respect to "cause for a prisoner's procedural default of a claim of ineffective assistance *at trial*." ___ U.S. at ___, 132 S. Ct. at 1315 (emphasis added). "*Martinez* does not provide a vehicle to set aside procedural default of any constitutional claim, but only preserves ineffective-assistance-of-trial-counsel challenges forfeited because of ineffective assistance of habeas counsel." *Tabler v. Stephens*, ____ F. App'x ___, 2014 WL 4954294, at *8 (5th Cir. Oct. 3, 2014). The Fifth Circuit has specifically declined to extend *Martinez* to *Strickland* claims involving appellate counsel's representation. *See Reed v. Stephens*, 739 F.3d 753, 778 n.16 (5th Cir. 2014); *see also see also Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013) ("Under *Martinez's* unambiguous holding . . . ineffective assistance of post-conviction counsel cannot supply cause for procedural default of a claim of ineffective assistance of appellate counsel."); *Banks v. Workman*, 692 F.3d 1133, 1148 (10th Cir. 2012) (holding that *Martinez* applies only to procedural default of a claim of ineffective assistance at trial, not to claim of ineffective assistance of appellate counsel); *but see Ha Van Nguyen v. Curry*, 736 F.3d 1287, 1289 (9th Cir. 2013) (holding that *Martinez* applies to  ineffective assistance of counsel claims involving appellate counsel). Under current circuit authority, *Martinez* cannot allow review of Bible's defaulted claim.

Even if *Martinez* applied, however, Bible has not provided enough information to decide whether his state habeas attorney provided ineffective representation. Bible's cursory argument

does nothing more than observe that habeas counsel did not raise his now-barred claim. Such perfunctory briefing is insufficient to show cause. *See Hittson v. GDCP Warden*, 759 F.3d 1210, 1265 (11th Cir. 2014) (finding that "generalized allegations are insufficient in habeas cases" to meet the *Martinez* exception); *see also Smith v. Murray*, 477 U.S. 527, 535 (1986) ("'[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default.'") (quoting *Murray v. Carrier*, 477 U.S. 478, 486-87 (1986)).

Here, state habeas counsel filed a habeas application raising seven grounds for relief. State habeas counsel challenged appellate counsel's choice of claims, but did so in a different manner than Bible does now. Because Bible has not developed his *Martinez* arguments, the record does not disclose whether state habeas counsel strategically decided to focus the *Beck* claim on problems with the evidence of sexual assault rather than on intent, perceived factual weakness in the barred claims, decided to center on stronger arguments, or was simply negligent.[13] As Bible provides nothing more than the most superficial assertions that would erode the presupposition that habeas counsel provided constitutionally adequate representation under traditional *Strickland* principles, Bible has not made an adequate showing that state habeas counsel performed deficiently.[14]

---

[13] An effective attorney does not raise every nonfrivolous claim. *See Smith*, 477 U.S. at 536 (focusing on issues "more likely to prevail, far from being evidence of incompetence, is the hallmark of effective . . . advocacy). For the same reasons that the Court denies this claim in the alternative, the Court finds that Bible's underlying claim is not "substantial." *Martinez*, ___ U.S. at ___, 132 S. Ct. at 1318.

[14] Bible's failure to provide adequate briefing to overcome a procedural bar is sharpened by the complexity of his argument. Bible cannot overcome the procedural hurdle by merely showing that state habeas counsel should have raised the precise ineffective-assistance-of-appellate-counsel argument he presented on state habeas review. In replying to Respondent's assertion of the procedural defense, Bible cursorily states that "[t]he alleged procedural default of the claim is excused as a consequence of state habeas counsel's failure to argue ineffective assistance of *trial* and appellate counsel for failing to raise the issue at trial and thereafter also on direct appeal." (Docket Entry No. 20 at 8) (emphasis added). Bible must also show that *trial counsel* provided deficient representation by not making the same *Beck* argument that he proposes on federal review. In requesting a lesser-included-offense

Accordingly, a procedural bar prevents this Court from adjudicating the merits of Bible's ineffective-assistance-of-appellate-counsel claim.

## C.  Alternative Review of the Merits

Bible asserts that his appellate counsel should have argued that the trial court erred by not instructing the jury on simple murder.  Under Texas law, failure to instruct on a lesser-included offense causes harm when the jury is faced with the dilemma of "whether to convict on the greater inclusive offense about which it harbors a reasonable doubt, or to acquit a defendant it does not believe to be wholly innocent."  *Saunders v. State*, 913 S.W.2d 564, 569 (Tex. Crim. App. 1995) (citing *Beck*, 447 U.S. at 100).  Capital murder, as it relates to this case, requires that the actor intentionally kill while committing or attempting to commit aggravated assault.  Clerk's Record at 14; TEX. PENAL CODE § 19.03(a)(2).[15]  Murder differs from capital murder in two ways.  First, murder does not require a predicate aggravating circumstance, like the contemporaneous commission of a felony.  Second, murder requires *either* an intentional or knowing mental state.  *See* TEX. PENAL CODE § 19.02(b)(1).

---

instruction, trial counsel only argued that the evidence did not support the aggravated sexual assault element necessary for a capital conviction. Tr. Vol. 17 at 84.  If appellate counsel had raised the same claim that Bible does on federal review, the Texas courts almost certainly would have found that Bible had procedurally defaulted it because trial counsel did not make a contemporaneous objection to that effect. *See Livingston v. Johnson*, 107 F.3d 297, 311 (5th Cir. 1997) (observing that Texas' contemporaneous objection rule requires "a party to preserve an issue for appellate review" by making "a timely objection with specific grounds for the desired ruling").  Bible has not shown that trial counsel made the wrong objection.  Trial counsel extensively argued in closing that the police had botched their investigation into the evidence of sexual assault. Tr. Vol. 18 at 23-24.  In fact, Bible's new proposed defense – that he intended to rape the victim but not kill her – runs directly at odds with trial counsel's theory.  Bible has not provided anything but the barest allegation that trial counsel made the wrong objection.  Bible has not provided adequate briefing to decide whether trial counsel, either through failure to investigate or through ineptness, chose the wrong defensive strategy.  Given Bible's failure to develop the issue, his briefing does not indicate that any ineffective-assistance-of-trial-counsel argument has "some merit." *Martinez*, ___ U.S. at ___, 132 S. Ct. at 1318.

[15] Texas law defines "intentionally" as a "conscious objective or desire to engage in the conduct or cause the result." TEX. PENAL CODE § 6.03.  Knowing conduct "is reasonably certain to cause the result." TEX. PENAL CODE § 6.03.

If Bible intends to advance the same claim that he raised on state habeas review, his briefing has not shown that the state court was unreasonable in finding no appellate ineffective assistance for not advancing a *Beck* claim. The state habeas court found that "appellate counsel cannot be considered ineffective for not advancing a direct appeal claim that the trial court allegedly erred in denying the request for an instruction on the lesser-included offense of murder." State Habeas Record at 416. The state habeas court based this decision on the abundant evidence of sexual assault, primarily because Bible "admitted in his statement that he grabbed [Mrs. Deaton] and forced her to the ground; that he believed he ripped off her blouse; that he remembered having sex and that he remembered strangling [her] and using a knife." State Habeas Record at 414. Specifically, Bible stated: "I believe I forced her to have sex with me." State Habeas Record at 263. The evidence supported the events described in Bible's confession. Mrs. Deaton was "found nude from the waist down with her ripped panties around her leg and her body positioned so that her pubic area was clearly exposed" and she had "suffered injuries to her vagina and anus including a tear to her vagina from blunt force trauma" suggesting to the medical examiner that she "was vaginally assaulted and possible anally assaulted." State Habeas Record at 415. While the DNA testing did not result in a match for Bible, "the presence of DNA evidence is not a required element of the offense of capital murder; the absence of [Bible's] DNA profile does not preclude the [his] sexual assault or attempted sexual assault of [Mrs. Deaton]; and that [Bible's] jury was aware of the results of the DNA testing as well as evidence establishing [his] guilt." State Habeas Record at 415. Bible makes no effort to overcome the presumptive integrity of these findings under the AEDPA. In fact, Bible now concedes that his confession adequately described sexually assaulting Mrs. Deaton. (Docket Entry No. 5 at 83).

Bible has also not shown an entitlement to relief insofar as he now argues that trial counsel, along with his appellate attorney, should have based a *Beck* challenge on insufficient evidence supporting his intent. Bible's federal claim goes to the heart of the defense's case at trial. The defense tried to lessen the chances of a capital conviction by highlighting problems in the State's evidence of sexual assault. Trial counsel premised the defense's case on claims that the police botched their investigation, leaving reasonable doubt about whether Bible sexually assaulted the victim. Bible's federal arguments, however, presume that he raped Mrs. Deaton – a defense entirely inconsistent with that advanced by trial counsel. Bible has not made any effort to show that trial counsel erred in his selection of strategy. Bible has not provided an argument proving that a reasonable and competent attorney would forgo trial counsel's chosen defense for one that would allow for a lesser-included-offense instruction based on intent.[16]

On its face, however, Bible does not make a compelling argument that the trial court should have given jurors the option of finding that he did not intentionally kill the victim. Bible argues "it is impossible to tell whether [he] intentionally murdered Deaton during the course of committing sexual assault, or whether Deaton's death was the unintentional result of the commission of an act (or acts) clearly dangerous to human life." (Docket Entry No. 5 at 84). Bible argues that a rational jury would have reasonable doubt whether when he stabbed Mrs. Deaton he intended to cause her death "or merely to subdue [her] to facilitate the assault." (Docket Entry No. 5 at 84). Bible says that "[t]he evidence introduced during the guilt-

---

[16] Bible argues that "[p]ost-hoc speculation regarding possible reasons for trial counsel's decision to pursue a lesser included offense instruction based on one arguably viable ground (because the evidence is insufficient to prove conclusively that Bible raped or attempted to rape Deaton), but not another (because the evidence is insufficient to prove conclusively that Bible intentionally killed Deaton), does not render his performance constitutionally inadequate." (Docket Entry No. 20 at 7-8). However true that assertion may be, Bible bears an obligation to show that trial counsel was ineffective for not advancing the defensive argument that he proffers on federal review (which would have established the basis for a lesser-included-offense instruction).

innocence phase of Bible's capital trial permitted a rational construction that the murder was something other than intentional." (Docket Entry No. 5 at 83).

In his confession, Bible claimed that he did not remember how he killed Mrs. Deaton. State Habeas Record at 265. Bible, however, admitted to the police that he stabbed the victim. State Habeas Record at 331. The evidence showed that he stabbed her eleven times – nine times in her chest and twice in her back -  and also cut her throat. Bible also confessed that he had strangled her. State Habeas Record at 331. While Bible made self-serving statements to the police that he could not remember the actual killing, he also contradicted himself on that point. State Habeas Record at 334. Given that record, a reasonable trial attorney could chose not to ask the jury to find no intent. Even if trial counsel made that argument, an appellate attorney could make a reasonable decision not to challenge the trial court's denial of any lesser-included-offense instruction. As with his state habeas claim challenging the evidence of sexual assault, "appellate counsel cannot be considered ineffective for not advancing a direct appeal claim that the trial court allegedly erred in denying the request for an instruction on the lesser-included offense of murder and, instead, choosing to advance other claims on direct appeal of the instant offense." State Habeas Record at 416. Even if Bible had presented the instant claim on state review, he has shown that the state courts would not (and should not) find that appellate counsel was "not ineffective for choosing not to advance the meritless claim on direct appeal" and also "offers no proof that the results of the proceeding would have been different, but for appellate counsel's not presenting on direct appeal the cited claim." State Habeas Record at 416. If a procedural default did not bar federal review, the Court would, nevertheless, deny Bible's ineffective-assistance-of-appellate-counsel claim.

## V.     Bible's Confession to Sexually Assaulting Five Young Nieces (claim 5)

After his arrest, Bible confessed to several crimes, including the sexual assault of five young nieces. The State gave the defense notice that it intended to put Bible's police statements before the jury in the punishment phase to demonstrate his future danger to society. Bible moved to suppress his confessions. Bible relied on the common-law *corpus delicti* doctrine which "ensure[s] that a person is not convicted of a crime that never occurred, based solely upon that person's extra-judicial confession." *Salazar v. State*, 86 S.W.3d 640, 644 (Tex. Crim. App. 2002). In a suppression hearing, Bible argued:

> There are statements that the Defendant made that the State may try to get into evidence with no evidence, no corpus delicti, no proof of the crime other than the Defendant saying that and just short circuiting everything in the case law if you prove a crime committed -- committed that a Defendant's confession is enough to convict but you have to prove that the crime was committed.
>
> You can't just invent a crime because the Defendant said they did it.

Tr. Vol. 14 at 12. The State responded that corroboration was unnecessary, but would still be fulfilled when two of the victims testified:

> Then Detective Walker is going to offer through him the tape of the five different sexual assaults of children that happened in San Jacinto County. That's a taped confession of those five girls right now. I have two of them – two coming for sure.
>
> And it is our position . . . that that confession alone makes those others admissible whether we have those little girls or not. I'm not going to force some 11-year-old child who was five when she was raped by him to have to come to court to testify. His confession should be admissible in the punishment phase of a capital murder case.

Tr. Vol. 14 at 15-16. The trial court denied the suppression motion. Tr. Vol. 15 at 31-32.

One of the victims testified at trial. She explained how Bible had repeatedly sexually assaulted her and two of the other victims. Tr. Vol. 22 at 15-40. The State, however, did not present any other evidence to corroborate Bible's assault of the remaining two girls. On that basis, the defense requested that the jury not hear about the assault of those two victims. Tr. Vol. 22 at 95.[17] The trial court again denied Bible's motion.

On direct appeal, Bible argued that the State's failure to corroborate his confession violated the Texas and United States Constitutions. The Court of Criminal Appeals had not previously decided whether the *corpus delicti* doctrine applied in the punishment phase of a capital murder trial. The Court of Criminal Appeals qualified that "the *corpus delicti* doctrine is concerned with preventing a *conviction* from being based solely upon a false confession." *Bible*, 162 S.W.3d at 247. The introduction of evidence in the punishment phase, however, does not raise concerns about the integrity of a conviction. Thus, courts are "not faced with the specter of a totally innocent defendant being convicted for a crime that never occurred solely on the basis of a confession resulting from official coercion or the defendant's own delusions." *Id*. Accordingly, the Court of Criminal Appeals held that "the *corpus delicti* doctrine does not apply to extraneous offenses offered at the punishment phase of a capital murder trial." *Id*.

Bible's fifth ground for relief contends that the State's failure to comply with the *corpus delicti* doctrine violated his federal due process and Eighth Amendment rights. Bible's claim, however, does not implicate federal constitutional concerns. The Fifth Circuit has unequivocally

---

[17] Bible objected to the introduction of the confession because "an alleged confession wouldn't be sufficient to prove a crime." Tr. Vol. 19 at 16. The defense argues that the prosecution must shore up his confession with "independent evidence that the crime occurred." Tr. Vol. 19 at 19. The State countered that "the fact that he confessed to raping those little girls on tape makes it admissible. We don't have to have them all here and come in here and independently say, in addition to his admitting that he raped them. He confessed on tape with the rights given to him voluntarily that he committed the rapes." Tr. Vol. 19 at 17. The trial court denied Bible's motion. Bible unsuccessfully renewed his objection later in the punishment phase. Tr. Vol. 19 at 95.

held that "Texas' *corpus delicti* requirement is not constitutionally mandated." *Lucas v. Johnson*, 132 F.3d 1069, 1078 (5th Cir. 1998); *see also West v. Johnson*, 92 F.3d 1385, 1393-94 (5th Cir. 1996) (finding "no authority for the proposition that application of that rule is constitutionally mandated"); *Autry v. Estelle*, 706 F.2d 1394, 1407 (5th Cir. 1983) (stating that "[s]uch a state rule of 'corpus delicti' has no independent constitutional footing"). The fact that the testimony came before the jury in the punishment phase of the trial, where the State has a less-stringent evidentiary burden, further diminishes any federal constitutional concerns. *See Reed v. Stephens*, 739 F.3d 753, 789 (5th Cir. 2014) ("[E]xtraneous offenses offered at the punishment phase of a capital trial need not be proven beyond a reasonable doubt[.]") (quotation omitted). Bible has not shown that this claim merits federal habeas relief.

## VI.     Prosecutorial Argument (claim six)

Bible's sixth claim argues that the prosecutor's summation in the penalty phase violated his constitutional rights. Under Texas state law, "proper jury argument must fall within one of the following categories: (1) summary of the evidence; (2) reasonable deduction from the evidence; (3) in response to argument of opposing counsel; and (4) plea for law enforcement." *Borjan v. State*, 787 S.W.2d 53, 55 (Tex. Crim. App. 1990); *see also Wilson v. State*, 7 S.W.3d 136, 147 (Tex. Crim. App. 1999). Bible complains about three categories of argument. First, Bible objects because the prosecutor told the jurors that Bible was "evil" and that he "deserved to die." Tr. Vol. 23 at 8-10, 73-74. Second, the prosecutor emphasized Bible's confession to the sexual assault of his nieces, which ground for relief argues lack of sufficient corroboration. Tr. Vol. 23 at 66. Third, the prosecutor argued that Bible failed to present any evidence of being a "model prisoner," allegedly shifting the burden of proof on future dangerousness to Bible. Tr. Vol. 23 at 15.

Bible complained about two of the categories on direct appeal.[18]  Bible did not challenge the prosecution's comments about his confession to sexual assault.  The Court of Criminal Appeals found that the prosecution's argument that Bible deserved to die was not "an argument based solely on emotion," but a permissible comment relating to the special issues.  *See id.*; TEX. CODE CRIM. PRO. art. 37.0711 (allowing the parties to argue "for or against a death sentence").  Also, the Court of Criminal Appeals found that the prosecutor's argument did not shift the burden to the defense, but was a proper comment on the defense's failure to adduce testimony.  *See Bible*, 162 S.W.3d at 249.  As previously discussed, the Court of Criminal Appeals also held that "the *corpus delicti* doctrine does not apply to extraneous offenses offered at the punishment phase of a capital murder trial."  *Id.* at 247.

Bible has not shown that the prosecutor's comments violated federal law.  The Due Process Clause protects against prosecutorial excess in closing summation.  *See Darden v. Wainwright*, 477 U.S. 168, 180 (1986); *Caldwell v. Mississippi*, 472 U.S. 320, 337-38 (1985); *Rogers v. Lynaugh*, 848 F.2d 606, 608 (5th Cir. 1988).  The Supreme Court has cautioned that a government attorney "may prosecute with earnestness and vigor - indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."  *Berger v. United States*, 295 U.S. 78,  88 (1935).  Still, a federal habeas court's review of prosecutorial misconduct claims is "'the narrow one of

[18] Respondent argues that Bible's direct appeal did not specifically challenge the prosecutor's comment about him being evil, rendering that portion of his federal argument unexhausted.  Bible counters that, while possibly not mentioning those comments, the overarching theme of his direct appeal covered that portion of the prosecutor's argument.  Because Bible has not shown an entitlement to relief on the issue, the Court will deny his claim on the merits without resolving the procedural concerns.  *See* 28 U.S.C. § 2254(b)(2) (allowing courts to deny unexhausted claims on the merits); *see also Malicoat v. Mullin*, 426 F.3d 1241, 1256 (10th Cir. 2005) (upholding state courts' rejection of prosecutorial misconduct claim where the prosecutor had called the defendant "evil" and a "monster"); *Hutchison v. Bell*, 303 F.3d 720, 751 (6th Cir. 2002) (upholding state courts' rejection of prosecutorial misconduct claim where the prosecutor had described the defendant as having "evil ways" and being an "evil force").

due process, and not the broad exercise of supervisory power.'"  *Darden*, 477 U.S. at 180 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)).  "'A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone.  The determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict.'"  *United States v. Bernard*, 299 F.3d 467, 488 (5th Cir. 2002) (quoting *United States v. Iredia*, 866 F.2d 114, 117 (5th Cir. 1989)); *see also Styron v. Johnson*, 262 F.3d 438, 449 (5th Cir. 2001); *Ortega v. McCotter*, 808 F.2d 406, 408 (5th Cir. 1987).

Here, the Court of Criminal Appeals found that the prosecutor's argument was not improper; they fell within those categories that Texas recognizes as permissible.  The prosecutor's brief and intermittent comments came at the end of extensive testimony about Bible's long life of brutality and violence.[19]  Bible has not shown that prosecutorial misconduct rendered this trial fundamentally unfair.  Accordingly, the state court's rejection of this claim was not contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).

## EVIDENTIARY HEARING

Bible has filed a motion for an evidentiary hearing, particularly to develop evidence relating to how his permanent disabilities render him no longer a future societal danger.  (Dkt. No. 21).  Because no factual issues need development for a fair adjudication of Bible's claims, the Court will deny his motion for an evidentiary hearing.

---

[19] Even insofar as the prosecution highlighted that Bible did not support his own arguments with evidence, Bible has not shown that merely pointing to the absence of evidence is equivalent to asking jurors to abandon their duty to answer the special issues as described in the jury instructions.

## CERTIFICATE OF APPEALABILITY

The AEDPA prevents appellate review of a habeas petition unless the district or circuit courts certify specific issues for appeal. *See* 28 U.S.C. § 2253(c); FED. R. APP. PRO. Rule 22(b). Bible has not yet requested that this Court grant him a Certificate of Appealability ("COA"), though this Court can consider the issue *sua sponte*. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000). A court may only issue a COA when an inmate "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Clear and binding precedent forecloses relief on Bible's claims. Under the appropriate standard, Bible has not shown that this Court should authorize appellate consideration of any claim. This Court will not certify any issue for review by the Fifth Circuit.

## CONCLUSION

For the reasons described above, the Court finds that Bible has not shown entitlement to federal habeas relief. Accordingly, the Court **DENIES** Bible's habeas petition. The Court also **DENIES** Bible's motion for an evidentiary hearing. No Certificate of Appealability will issue in this case.

SIGNED on this 30th day of October, 2014.

_____
Kenneth M. Hoyt
United States District Judge